UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CARMEN ROSARIO,

                Plaintiff,

       *- against -*

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

21 Civ. 1151 (AEK)

**DECISION AND ORDER**

---

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.**[1]

      Plaintiff Carmen Rosario brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner"), which denied her application for disability insurance benefits ("DIB") under the Social Security Act (the "Act"). ECF No. 1. Currently pending before the Court are Plaintiff's motion, and the Commissioner's cross-motion, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. ECF Nos. 27, 29. For the reasons that follow, Plaintiff's motion (ECF No. 27) is DENIED, the Commissioner's motion (ECF No. 29) is GRANTED, and the Clerk of Court is directed to enter judgment in favor of the Commissioner.

---

[1] The parties consented to the jurisdiction of the undersigned for all purposes pursuant to 28 U.S.C. § 636(c) on June 2, 2021. ECF No. 15.

# BACKGROUND

## I.      Procedural Background

On March 6, 2019, Plaintiff filed an application for DIB, alleging July 11, 2018 as the

onset date of her disability.  Administrative Record ("AR") 20, 72.[2]  In her initial filing, Plaintiff

claimed she was disabled due to bipolar disorder, arthritis, fibromyalgia, back pain, and

spondylosis.  AR 61-62.  After the Social Security Administration (the "SSA") denied her claim,

AR 72, 86-91, 93-98 (denial on reconsideration), Plaintiff requested a hearing before an

administrative law judge ("ALJ"), AR 99.  An administrative hearing was held on July 8, 2020,

and Plaintiff appeared by telephone and testified.  AR 35-60.  Plaintiff was represented by

counsel at the hearing, and vocational expert ("VE") Dale Pasculli also testified at the hearing.

*Id.*

ALJ Angela Banks issued a decision on July 28, 2020, finding that Plaintiff was not

disabled within the meaning of the Act from the alleged onset date, July 11, 2018, through the

date of the decision, July 28, 2020.  AR 20-30.  Plaintiff subsequently filed a request for review

of the ALJ's decision with the SSA's Appeals Council, which was denied on December 15,

2020.  AR 1-6.  That made the ALJ's July 28, 2020, decision the final decision of the

Commissioner.  The instant lawsuit, seeking judicial review of the ALJ's decision, followed.

ECF No. 1.

## II.      Testimonial, Medical, and Vocational Evidence

Both parties have provided summaries of the testimonial, medical, and vocational

evidence contained in the administrative record.  *See* ECF No. 28 ("Pl.'s Mem. of Law") at 1-14;

---

[2] Citations to "AR" refer to the certified copy of the administrative record filed by the
Commissioner.  ECF No. 19.

ECF No. 30 ("Def.'s Mem. of Law") at 2-9.  Based on an independent and thorough examination

of the record, the Court finds that the parties' summaries of the evidence are largely

comprehensive and accurate.  Accordingly, the Court adopts these summaries and discusses the

evidence in the record in more detail to the extent necessary to a determination of the issues

raised in this case.  *See, e.g.*, *Banks v. Comm'r of Soc. Sec.*, No. 19-cv-929 (AJN) (SDA), 2020

WL 2768800, at *2 (S.D.N.Y. Jan. 16, 2020), *adopted by* 2020 WL 2765686 (S.D.N.Y. May 27,

2020).

## APPLICABLE LEGAL PRINCIPLES

### I.      Standard of Review

The scope of review in an appeal from a Social Security disability determination involves

two levels of inquiry.  First, the court must review the Commissioner's decision to assess

whether the Commissioner applied the correct legal standards when determining that the plaintiff

was not disabled.  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  "'Failure to apply the

correct legal standards is grounds for reversal.'"  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir.

2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

Second, the court must evaluate whether the Commissioner's decision was supported by

substantial evidence.  *Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Id.* at 106 (quotation marks omitted).  The "substantial

evidence" standard of review is "very deferential," and it is not the function of the reviewing

court "to determine *de novo* whether a plaintiff is disabled."  *Schillo v. Kijakazi*, 31 F.4th 64, 74

(2d Cir. 2022) (quotation marks omitted).  To determine whether a decision by the

Commissioner is supported by substantial evidence, courts must "examine the entire record,

including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation marks omitted). "The substantial evidence standard means once an ALJ finds facts, [courts] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (quotation marks omitted) (emphasis in original).

## II.    Determining Disability

The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled under the Act if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow in determining whether a particular claimant is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The Commissioner first considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i),(b). If the claimant is engaged in substantial gainful activity, then the Commissioner will find that the claimant is not disabled; if the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to the second step, at which the Commissioner considers the medical severity of the claimant's impairments. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability

to do basic work activities." 20 C.F.R. § 404.1520(c).  If the claimant suffers from any severe impairment, the Commissioner at step three must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render an individual disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of the SSA regulations.  20 C.F.R § 404.1520(a)(4)(iii),(d).

If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(e).  A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a)(1).  After determining the claimant's RFC, the Commissioner proceeds to the fourth step to determine whether the claimant can perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv),(e)-(f).  If it is found that the claimant cannot perform his or her past relevant work, the Commissioner proceeds to step five to consider the claimant's RFC, age, education, and work experience to determine whether he or she can adjust to other work.  20 C.F.R. § 404.1520(a)(4)(v),(g).  To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, in light of his or her RFC and vocational factors, is capable of performing.  20 C.F.R. § 404.1560(c).

The claimant bears the burden of proof on the first four steps of this analysis.  *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps. *Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  *DeChirico*, 134 F.3d at 1180.

**DISCUSSION**

Plaintiff seeks to reverse the Commissioner's decision and requests that the Court award benefits or, in the alternative, remand the matter to the SSA for further administrative proceedings. She contends that the ALJ erred in (i) cherry-picking the evidence in the record, (ii) evaluating the medical opinion evidence, (iii) failing to follow the requirements of SSR 96-8p, and (iv) failing to properly consider the vocational expert's testimony. *See* Pl.'s Mem. of Law at 16-24; ECF No. 31 ("Pl.'s Reply Mem.") at 1-9. The Commissioner seeks to have her final decision affirmed; she maintains that the ALJ's decision is supported by substantial evidence and is based upon the application of correct legal standards. Def.'s Mem. of Law at 16-25.

As discussed below, the Court finds that the Commissioner applied the correct legal standards and that her decision is supported by substantial evidence; therefore, Plaintiff's motion is denied, the Commissioner's motion is granted, and judgment shall be entered in favor of the Commissioner.

## I.     The ALJ's Decision

ALJ Banks employed the five-step analysis described above and issued a decision finding that Plaintiff was not disabled from the alleged onset date of July 11, 2018, through the date of the decision, July 28, 2020. AR 20-30. First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 11, 2018. AR 20. Second, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease of the lumbar spine, bipolar disorder, and anxiety disorder. *Id.*[3] Third, the ALJ determined that Plaintiff did not have an

---

[3] The ALJ noted that Plaintiff was diagnosed with migraines and fibromyalgia, but that these impairments were both not severe. AR 20-21. Plaintiff has not contested the ALJ's findings with respect to these possible impairments.

impairment or combination of impairments that met or medically equaled the severity of one of

the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 23-24.

According to the ALJ, Plaintiff retained the RFC to perform light work, as defined in 20

C.F.R. § 404.1567(b),[4] with the exceptions that

> she can occasionally balance, stoop, crouch, kneel, crawl and climb ramps
> and stairs; and never climb ladders, ropes or scaffolds.  [She] cannot
> operate a motor vehicle as an occupational requirement, nor work at
> unprotected heights or around moving mechanical parts.  [She] remains
> able to perform the mental demands of work that requires [*sic*] her to
> understand, remember, and carry out instructions consistent with
> occupations that can be learned in up to 30 days.  She requires a setting
> that is goal-oriented versus requiring that she maintain a specified pace
> consistently throughout a workday.  She can tolerate occasional interaction
> with the public, and remains able to interact appropriately with supervisors
> and co-workers.

AR 24-25.

ALJ Banks determined Plaintiff's RFC by applying the two-step framework described in

20 C.F.R. § 404.1529 and SSR 16-3p.  AR 25-28.[5]  She concluded that although Plaintiff's

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a
job is in this category when it requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. §
404.1567(b).

[5] The ALJ specified that the first step in this process is to determine "whether there is an
underlying medically determinable physical or mental impairment(s)—*i.e.*, an impairment(s) that
can be shown by medically acceptable clinical or laboratory diagnostic techniques—that could
reasonably be expected to produce the claimant's pain or other symptoms."  AR 25.  The second
step in the process, "once an underlying physical or mental impairment(s) that could reasonably
be expected to produce the claimant's pain or other symptoms has been shown," is for the ALJ to
"evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine
the extent to which they limit the claimant's work-related activities."  *Id.*  "[W]henever
statements about the intensity, persistence, or functionally limiting effects of pain or other
symptoms are not substantiated by objective medical evidence, the [ALJ] must consider other
evidence in the record to determine if the claimant's symptoms limit the ability to do work-
related activities."  *Id.*

medically determinable impairments "could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." AR 25.  The ALJ reviewed and summarized the medical evidence in the record, including various medical opinions.  AR 25-28.  Based on this examination of the record, the ALJ concluded that although Plaintiff "alleged severe restrictions in her ability to sit, stand, walk, focus, concentrate, pay attention, and get along with others," "pursuant to longitudinal physical examination findings, [Plaintiff] generally presented with negative straight leg raise on the right, full strength in the lower extremities, and intact and equal sensation in the bilateral lower extremities."  AR 28.  The ALJ also noted that Plaintiff "received conservative treatment."  *Id.* In mental status examinations from February 2019 through June 2020, Plaintiff "consistently presented fully oriented, attentive, and cooperative with intact memory, concentration, normal mood, affect, and speech."  *Id.*  That said, the ALJ acknowledged that Plaintiff had "numerous diagnoses and complaints of pain, depression, anxiety, problems completing activities of daily living, difficulty getting along with others, and need[ed] treatment and medication to manage symptoms."  *Id.*  The ALJ's determination of Plaintiff's RFC took into account the limitations the ALJ found.  *Id.*

At the fourth step, citing the hearing testimony of the VE, the ALJ found that Plaintiff was unable to perform her past relevant work as an administrative assistant, sales clerk, and "sales person, art objects."  AR 28-29.

At the fifth step, the ALJ noted that Plaintiff, who was 44 years old on her alleged disability onset date, was a "younger individual"; that Plaintiff had at least a high school education; and that transferability of job skills was "not material to the determination of

disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not [Plaintiff] has transferable job skills."  AR 29.  The ALJ explained that if Plaintiff "had the residual functional capacity to perform the full range of light work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 202.21." *Id.*  But the ALJ concluded that Plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations."  *Id.*  Thus, "[t]o determine the extent to which these limitations erode the unskilled light occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and [RFC]."  *Id.*  The VE testified that Plaintiff could perform the requirements of unskilled, light jobs such as (1) photocopy machine operator (8,100 jobs in the national economy); (2) routing clerk (33,000 jobs in the national economy); and (3) housekeeper cleaner (103,000 jobs in the national economy).  AR 29-30; *see* AR 56.  Citing SSR 00-4p, the ALJ determined that the VE's testimony was "consistent with the information contained in the Dictionary of Occupational Titles."  AR 30.  Relying upon the VE's testimony, the ALJ found that, "considering [Plaintiff's] age, education, work experience, and [RFC]," Plaintiff could adjust to other work that existed in significant numbers in the national economy.  *Id.*  ALJ Banks therefore concluded that Plaintiff was not disabled from the alleged onset date, July 11, 2018, through the date of the decision, July 28, 2020.  *Id.*

## II.   Evidence Concerning Mental Impairments and the ALJ's Evaluation of the Medical Opinion Evidence Concerning Mental Impairments

Plaintiff contends that the ALJ erred because she "cherry-picked" the evidence in the record regarding Plaintiff's mental impairments, particularly with respect to the findings of consultative examiner David Schaich, Psy.D, and also erred in evaluating the medical opinion

evidence by failing to properly evaluate Dr. Schaich's opinion.  Pl.'s Mem. of Law at 16-20, 21-

22.  The Court considers these arguments together.

> ### A.        Standard for Evaluating Medical Opinion Evidence

Because Plaintiff filed her application for DIB after March 27, 2017, her claims are

governed by the SSA's current regulations concerning the consideration of medical opinions.

*See* 20 C.F.R. § 404.1520c.  "Under the new regulations, a treating doctor's opinion is no longer

entitled to a presumption of controlling weight."  *Knief v. Comm'r of Soc. Sec.*, No. 20-cv-6242

(PED), 2021 WL 5449728, at *6 (S.D.N.Y. Nov. 22, 2021) (quotation marks omitted).  Rather,

an ALJ will neither defer, nor give any specific evidentiary weight, to any medical opinion.  20

C.F.R. § 404.1520c(a).  Instead, an ALJ must evaluate the persuasiveness of all medical opinions

in the record based on five factors: (1) supportability; (2) consistency; (3) the medical source's

relationship with the claimant; (4) specialization; and (5) other factors that tend to support or

contradict the medical opinion.  20 C.F.R. § 404.1520c(c)(1)-(5).  Supportability and consistency

are considered the most important factors in evaluating a medical opinion.  20 C.F.R. §

404.1520c(b)(2); *see Knief*, 2021 WL 5449728, at *6.  With respect to supportability, "[t]he

more relevant the objective medical evidence and supporting explanations presented by a

medical source are to support his or her medical opinion(s) or prior administrative medical

finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s)

will be."  20 C.F.R. § 404.1520c(c)(1).  With respect to consistency, "[t]he more consistent a

medical opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)

or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  As part of his

or her decision, the ALJ must explain how the factors of supportability and consistency were

considered.  20 C.F.R. § 404.1520c(b)(2); *see Knief*, 2021 WL 5449728, at *6.  In general, the

ALJ may, but is not required to, explain how the other factors were considered.

### B.     The ALJ's Evaluation of the Dr. Schaich's Opinion

In his psychiatric evaluation report, Dr. Schaich opined as follows:

> There is no evidence of limitation in the ability to understand, remember, or apply simple directions and instructions.  No evidence of limitation in the ability to understand, remember, or apply complex directions and instructions.  Moderate limitation in the ability to use reason and judgment to make work-related decisions.  **Marked limitation in the ability to interact adequately with supervisors, coworkers, and the public**.  Moderate limitation in the ability to sustain concentration and perform a task at a consistent pace.  Moderate limitation in the ability to sustain an ordinary routine and regular attendance at work.  **Marked limitation in the ability to regulate emotions, control behavior, and maintain well-being**.  No evidence of limitation in the ability to maintain personal hygiene and appropriate attire.  No evidence of limitation in the ability to be aware of normal hazards and take appropriate precautions.  Difficulties are caused by anxiety, panic attacks, and bipolar disorder.
>
> Result of the examination appear to be consistent with psychiatric problems that **may significantly interfere with the claimant's ability to function on a daily basis.**

AR 309-10 (emphases added).

Plaintiff takes issue with the ALJ's decision to reject Dr. Schaich's opinion that Plaintiff

had "marked limitation" in both the ability to regulate emotions, control behavior, and maintain

well-being and the ability to interact adequately with supervisors, coworkers, and the public.

ALJ Banks explained that Dr. Schaich's findings of "marked limitations and inability to function

on a daily basis are not persuasive" because "longitudinal mental status exams were generally

normal and treatment records did not indicate findings consistent with marked limitations."  AR

27.  In support of this conclusion, the ALJ cited the treatment records from Plaintiff's treating

mental healthcare provider, accurately explaining that despite Plaintiff's reports of "anxiety,

depression, and irritability," regular mental status examinations from February 2019 through

11

June 2020 with that provider "noted that [Plaintiff] was fully oriented, attentive, and cooperative with intact memory, concentration, mood, affect, and normal speech."[6]  *Id.*; *see* AR 563-74, 814-19.  The ALJ also correctly cited Plaintiff's reports that she "felt more patient" in August 2019, AR 27; *see* AR 569, and that "her anxiety [was] better controlled, panic attacks are more manageable" in March, April, and May 2020, AR 27; *see* AR 816-18.  Lastly, the ALJ appropriately cited treatment records from Montefiore Medical Center from April 2019 through August 2019, which "noted normal mood, affect, attention span and concentration," AR 27; *see* AR 596, 694, as well as January 2020 treatment records from Montefiore Pain Management, which noted that Plaintiff "was alert and cooperative with normal mood, affect, attention span, and concentration."  AR 27; *see* AR 588.[7]

Plaintiff asserts that the ALJ cherry-picked from Dr. Schaich's opinion because she credited his mental status examination findings that Plaintiff was cooperative, fully oriented, presented with clear speech, fair insight and judgment, and showed average cognitive functioning, *see* AR 26-27, 308-09, while disregarding the fact that Dr. Schaich purportedly "*saw* that Plaintiff showed signs of mania, such as decreased need for sleep, flight of ideas, increased goal-directed activity, expansive mood, talkative/pressured speech, distractibility, psychomotor agitation, and excessive motor behavior in inappropriate places," Pl.'s Mem. at 17-18 (emphasis added).  But a careful reading of this portion of Dr. Schaich's evaluation strongly

---

[6] There is no medical opinion in the record from Plaintiff's treating mental healthcare provider.

[7] Other treatment records from Montefiore Pain Management not specifically cited by the ALJ also reflect the same mental status.  *See* AR 762 (February 2020:  "Alert and cooperative, normal mood and affect, normal attention span and concentration"), 798 (May 2020:  "Awake and alert, conversant, attends to the examiner").  Similarly, a note from a primary care visit in February 2020 states, "[p]resent psych meds are working" and "[m]anaging anger so much better."  AR 781.

suggests that all notations included in this section of the report were based on the symptoms that Plaintiff reported to Dr. Schaich, as opposed to conditions he observed during his examination. *See* AR 307-08 ("CURRENT FUNCTIONING" section of Dr. Schaich's evaluation described what Plaintiff "reports" or "denied").  Critically, the ALJ did not ignore Plaintiff's diagnoses— she found that Plaintiff's severe impairments included bipolar and anxiety disorders, AR 22—but she also found, based on the longitudinal treatment records, that Plaintiff was not as functionally limited as Dr. Schaich opined.  Indeed, as ALJ Banks accurately observed, Dr. Schaich's own mental status examination from the day of his consultative examination yielded results similar to those found throughout the record from Plaintiff's other healthcare providers.  AR 27 ("The records are consistent with the consultative examiners [*sic*] findings of mild and moderate limitation and with the RFC."); *see* AR 308-09, 314, 345, 440, 522, 539, 563-74, 581, 588, 694, 711, 716, 762, 770, 798, 814-19; *see also Vecchio v. Comm'r of Soc. Sec.*, No. 20-cv-8105 (MKV) (SLC), 2021 WL 8013772, at *15 (S.D.N.Y. Dec. 1, 2021) ("That the ALJ deemed only a portion of [the consultative examiner's] medical opinion to be persuasive . . . was not an act of impermissible cherry-picking . . . because the ALJ explained that a portion of her opinion was unpersuasive because it is inconsistent with the totality of the medical evidence in the record, including unremarkable mental status examinations.") (quotation marks omitted), *adopted by* 2022 WL 873175 (S.D.N.Y. Mar. 24, 2022).

While Plaintiff argues strenuously that the ALJ erred in rejecting Dr. Schaich's marked limitations findings, "the SSA and the courts have long recognized the dangers of over-reliance on the results of a single examination by a consultative source, especially in the context of mental illness where a one-time snapshot of a claimant's status may not be indicative of [his or] her longitudinal mental health."  *DuBois v. Comm'r of Soc. Sec.*, No. 20-cv-8422 (BCM), 2022

WL 845751, at *7 n. 9 (S.D.N.Y. Mar. 21, 2022) (cleaned up).  "Even where treating notes exist, consultative examiners typically do not have access to them, and consequently must rely in meaningful part on the claimant's subjective reports and anomalous presentation, rather than a full knowledge of the longitudinal nature of the claimant's impairments."  *Id.* (cleaned up). "This too can diminish the reliability of a consultative examiner's opinion."  *Id.*

Plaintiff also challenges the ALJ's reliance on the treatment records in rejecting Dr. Schaich's marked limitations findings, claiming that the ALJ wrongly relied on the results of mental status examinations conducted in the "controlled" setting of medical appointments.  *See* Pl.'s Mem. of Law at 18; Pl.'s Reply Mem. at 4.  But the Second Circuit has held that an ALJ is not obligated to accept the opinion of a consultative examiner where it is inconsistent with the plaintiff's contemporaneous treatment records.  *Pellam v. Astrue*, 508 F. App'x 87, 89-90 (2d Cir. 2013) (summary order).  Moreover, the case law cited by Plaintiff involved different contexts—specifically, application of the pre-March 2017 treating physician rule and instances in which the ALJ erroneously discounted a treating physician's opinion based on examination reports.  *See, e.g., Colgan v. Kijakazi*, 22 F.4th 353, 364 (2d Cir. 2022) (ALJ erred in failing to give controlling weight to treating physician's opinion on ground that it was unsupported by other substantial evidence, namely, the opinions of consultative examiners who reported on the plaintiff's appearance and functionality only on particular occasions); *Diana C. v. Comm'r of Soc. Sec.*, No. 19-cv-7474 (LGS) (GRJ), 2022 WL 1912397 (S.D.N.Y. Apr. 11, 2022) (ALJ wrongly discounted treating psychiatrist's opinion based on ALJ's reading of treatment notes), *adopted sub nom. by Cruz v. Comm'r of Soc. Sec.*, 2022 WL 1912310 (S.D.N.Y. June 3, 2022). Accordingly, ALJ Banks did not err in basing her decision not to accept Dr. Schaich's marked

limitations findings on Plaintiff's mental status examinations and longitudinal treatment records from her treating physicians.

"In evaluating the supportability of an opinion or prior administrative finding, an ALJ is expressly authorized to compare it to the 'objective medical evidence and supporting explanations' presented by the opining source." *DuBois*, 2022 WL 845751, at *8 (quoting 20 C.F.R. § 404.1520c(c)(1)). "Thus, supportability, under the new regulations, has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations presented by that source to support [his or] her opinion." *Id.* (quotation marks omitted). Here, the ALJ stated only that Dr. Schaich's findings of no limitations and moderate limitations were "consistent with the clinical exam and the overall treatment record," AR 27; she did not state that Dr. Schaich's marked limitations findings were supported by his examination. Indeed, a close reading of the ALJ's decision reflects her finding of an incongruity between Dr. Schaich's examination—which was similar to the treating examinations and, like them, supported moderate limitations at most—and his opinion of marked limitations in both the ability to regulate emotions, control behavior, and maintain well-being and the ability to interact adequately with supervisors, coworkers, and the public. This analysis satisfies the supportability factor. *See Rosario v. Comm'r of Soc. Sec.*, No. 20-cv-7749 (SLC), 2022 WL 819810, at *10 (S.D.N.Y. Mar. 18, 2022). "Consistency, on the other hand, is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record, which may or may not contain another medical opinion as a comparator." *DuBois*, 2022 WL 845751, at *8 (quotation marks omitted). As set forth above, the ALJ permissibly found Dr. Schaich's opinion inconsistent with the medical record as a whole. There was therefore no legal error in the ALJ finding that Dr. Schaich's opinion as to "marked limitations" was not persuasive—the

opinion lacked support in the record and was inconsistent with Plaintiff's mental health and other treatment records.

### C.       The Lack of Other Opinions in the Record

Plaintiff also maintains that the ALJ erred because "there was no opinion in the record contrary to Dr. Schaich's 'marked' limitations findings." Pl.'s Mem. of Law at 21. As noted previously, there is no opinion in the record from Plaintiff's treating mental healthcare provider. The only other opinion evidence in the record regarding Plaintiff's mental impairments are the opinions of State Agency psychological consultant J. Weitzen, Ph.D., who opined that Plaintiff "had no limitation in the ability to understand, remember, or apply information, mild limitation interacting with others, mild limitation in the ability to concentrate, persist, or maintain pace, and no limitation in the ability to adapt or manage oneself," AR 28; *see* AR 64-65, and of State Agency psychological consultant E. Kamin, Ph.D., who "affirmed" Dr. Weitzen's opinion. AR 28; *see* AR 77. Both of these opinions indicated fewer limitations for Plaintiff than the opinion of Dr. Schaich. The ALJ found that these opinions were "not persuasive as evidence submitted at the hearing level indicated greater psychiatric limitations," AR 28, and the RFC reflected the ALJ's assessment of a need for greater limitations than recommended by these medical sources.

But "[t]here is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations[,]" even when there is no other opinion evidence in the record. *Pellam*, 508 F. App'x at 89; *see also DuBois*, 2022 WL 845751, at *8 ("Nor was the ALJ required to accept [the consultative examiner's] opinion simply because it was not contradicted by another opinion."). Moreover, as set forth above, there was substantial evidence in the record, namely, Plaintiff's treatment records, which supported the ALJ's decision not to accept Dr. Schaich's opinion of marked limitations with respect to the ability to regulate

emotions, control behavior, and maintain well-being and the ability to interact adequately with supervisors, coworkers, and the public.  *Pellam*, 508 F. App'x at 90 ("substantial evidence supported the ALJ's decision not to adopt many of [the consultative examiner's] conclusions" including, among other things, that the consultative examiner's findings "were inconsistent with nearly contemporaneous medical records from [the plaintiff's] treating physicians").  Similarly, although an ALJ's RFC determination "may not perfectly correspond with any of the opinions of medical sources cited in his [or her] decision, he [or she] [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."  *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order); *see DuBois*, 2022 WL 845751, at *8 ("Because the ALJ was expressly authorized—indeed, required—to consider whether [the consultative examiner's] opinion was consistent with the entire record, plaintiff's argument that in so doing the ALJ inappropriately substituted his own lay judgment for that of a qualified medical expert is unavailing.") (cleaned up).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *see Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  It was therefore entirely appropriate for the ALJ to resolve conflicts in the medical evidence and formulate an RFC based on those determinations.  For all of these reasons, the Court finds that ALJ Banks carefully considered the record in determining Plaintiff's RFC, and that the ALJ's analysis of the supportability and consistency of Dr. Schaich's opinion was legally adequate and based on her assessment of the record as a whole.

### D.   Inconsistency of Plaintiff's Reports

Finally, Plaintiff cites as further evidence of purported cherry-picking with respect to her mental impairments that the ALJ's own discussion of the record revealed significant contrasts

between Plaintiff's seemingly positive presentation on examination and her reports of ongoing mental health symptoms.  *See* Pl.'s Mem. of Law at 19; AR 27.  Similar contrasts were apparent in the ALJ's discussion of Plaintiff's ability to perform certain activities in the context of step three of the disability analysis and Plaintiff's responses to questions on the Function Report form that she completed.  Pl.'s Mem. of Law at 19; *see, e.g.,* AR 24, 237-44.  But Plaintiff does not explain how this claimed cherry-picking relates to the ALJ's alleged error in rejecting Dr. Schaich's "marked limitations" findings in making her RFC determination, nor does she contest the ALJ's finding at step three of the disability analysis.  Moreover, in her moving brief, Plaintiff does not challenge the ALJ's credibility determination; she states only in her reply brief, in a wholly conclusory manner in the context of her cherry-picking argument, that "the ALJ's finding that [Plaintiff] was not credible was not supported by substantial evidence."  Pl.'s Reply Mem. at 4.

In any event, with respect to the ALJ's discussion of the functional area of "interacting with others" at step three, the ALJ specifically pointed out the inconsistencies in what Plaintiff reported in the Function Report, *i.e.*, "that she went outside independently and travelled via public transportation," but "she had problems getting along with family, friends, and neighbors" and "getting along with authority figures."  AR 24.  The ALJ further recited that "treatment records consistently noted that [Plaintiff] presented calm and cooperative (Exhibit 3F, 7F)," and that "[t]hese findings are consistent with moderate limitation interacting with others."  *Id.*[8]

---

[8] Notably, Plaintiff reported to Dr. Schaich that "[s]he socializes some.  Family relationships are good."  AR 309.  And although Plaintiff reported to her treating psychiatrist on June 11, 2020—the last date for which there is a treatment note—that she "[h]ad an incident where she felt more angry/aggressive," she also reported "feeling progress" and that she was "[e]ngaging in therapy . . . feels calm . . . her anxiety is better controlled, panic attacks are more manageable . . . ."  AR 819.  Similarly, while Plaintiff reported that she was struggling with stress and anxiety, she also reported improvements in her mental health.  *See* AR 816 (March 16,

Courts "defer to an ALJ's decision to discredit subjective complaints if the decision is supported by substantial evidence." *Watson v. Berryhill*, 732 F. App'x 48, 52 (2d Cir. 2018) (summary order) (citing *Aponte v. Sec., Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). It is difficult to understand why Plaintiff thinks that the ALJ should be faulted for pointing to inconsistencies in the record. "Cherry-picking" would be a more appropriate argument if the ALJ had ignored potentially contradictory evidence. Here, the ALJ acknowledged that evidence, but found that the record as a whole supported a different conclusion. Based on the Court's independent and thorough review of the record, there is substantial evidence—particularly in Plaintiff's mental health treatment records—to support the ALJ's determination not to credit Plaintiff's statements about the severity of her symptoms and to conclude that Plaintiff was only moderately limited in her ability to interact with others.

## III.    Evidence Concerning Physical Impairments

### A.    Plaintiff's Contentions

Plaintiff contends that the ALJ "discounted the consistent reports of severe pain due to lumbosacral spondylosis and joint degeneration, . . . that [Plaintiff] actually felt worse with increased activity and better with rest, . . . and that the pain interfered with [activities of daily living], . . . in favor of an ability to balance, stoop, crouch, kneel, crawl, and climb ramps and stairs." Pl.'s Mem. of Law at 20 (citing administrative record). More specifically, Plaintiff argues that the ALJ "completely ignored the insight provided" by Nurse Practitioner ("NP") Dennerlein, citing a progress note in which NP Dennerlein stated that "[t]here appeared to be

---

2020 treatment note: "Reports her anxiety is better controlled, panic attacks are more manageable"), 817 (April 16, 2020 treatment note: "Taking medications and reports feeling okay. She feels calm."), 818 (May 14, 2020 treatment note: "Taking medications and reports feeling okay. Engaging in therapy. She feels calm.").

inconsistencies with regard to the pain complaint, review of imaging, and exam and would therefore consider psychiatric counseling as suspect that [Plaintiff's] depression and anxiety are impacting her pain perception."  AR 442 (repeated at AR 444).

**B.     The ALJ's Decision is Supported By Substantial Evidence in the Record**

The significance of NP Dennerlein's speculation in her treatment note is unclear. Although Plaintiff maintains that NP Dennerlein's suspicion regarding the impact of Plaintiff's mental impairments on her pain perception supports a finding of mental disability, *see* Pl.'s Reply Mem. at 7, for the reasons stated above, the Court finds that with respect to Plaintiff's mental impairments, the ALJ applied the correct legal standard, and her RFC finding is supported by substantial evidence.  With respect to Plaintiff's physical impairments, as explained below, the ALJ's RFC determination is also supported by substantial evidence.

As the ALJ concluded in her decision, although Plaintiff "alleged severe restrictions in her ability to sit, stand, [and] walk . . . pursuant to longitudinal physical examination findings, [Plaintiff] generally presented with negative straight leg raise on the right, full strength in the lower extremities, and intact and equal sensation in the bilateral lower extremities."  AR 28. Indeed, physical examinations throughout the relevant period noted primarily full range of motion, with only occasional decreased range of motion and tenderness in the lumbar spine, full strength and normal sensation in the lower extremities, normal reflexes, negative bilateral straight leg raising, and normal gait.  *See* AR 314 (May 2017), AR 345-46 (August 2017), AR 388 (June 8, 2018), AR 440 (June 27, 2018), AR 455 (December 2018), AR 478 (March 14, 2019 examination all normal except for limited range of motion and pain in left hip), AR 493 (March 26, 2019 examination all normal except tenderness in thoracic and lumbar spine and inability to perform straight leg raise), AR 522-23 (April 2019 examination all normal except for

bilateral positive facet load tests), AR 616-17 (May 2019 examination all normal except
tenderness in thoracic and lumbar spine and inability to perform straight leg raise), AR 694-95
(August 2019 examination all normal except for positive bilateral facet load tests and tenderness
in the bilateral lower lumbar spine), AR 588 (January 6, 2020 examination all normal except for
some pain and reduced strength/range of motion in left hip as well as left positive straight leg
raise), AR 733 (January 21, 2020 examination report noted only paraspinal cervical tenderness
and spasms), AR 581-82 (February 3, 2020 examination all normal except for positive left
straight leg raise, decreased sensation at left L5 and S1, pain in left lumbar joints, and tenderness
in left paraspinal muscles at L2-L5), AR 798 (May 2020 video-enabled examination found that
Plaintiff moved all extremities symmetrically against gravity and noted that Plaintiff
demonstrated/identified bilateral lower back pain).

     In addition, the ALJ took into account other objective evidence in the record—namely,
the imaging studies of Plaintiff's lumbar spine—which showed only minimal findings.  A lumbar
spine X-ray taken in August 2017 found only "[m]inimal L5-S1 facet arthropathy," AR 369, and
hip and lumbar spine X-rays taken in March 2019 showed only "[m]ild L4-L5 disc space
narrowing," mild hip degenerative joint disease, and no instability.  AR 484.  A lumbar spine
MRI taken in September 2017 found "[d]isc and facet degeneration at L4-L5 and L5-S1,
including a small right central disc protrusion at L5-S1, with mild canal and foraminal
narrowing," AR 373, but was "otherwise unimpressive."  AR 381.  A subsequent lumbar spine
MRI taken in January 2020 found "[n]o acute compression fracture.  Degenerative changes
causing mild spinal stenosis and bilateral neural foraminal stenosis at L4-L5 and L5-S1, similar
to the prior exam."  AR 590.

Overall, there is substantial evidence in the record to support the ALJ's determination that Plaintiff was not as physically limited as she claimed, and that the RFC reflected Plaintiff's actual capabilities.  There is no objective medical evidence to support a finding of physical disability, and if anything, NP Dennerlein's statement that there were "inconsistencies with regard to the pain complaint, review of imaging, and exam," AR 442, 444, provides support for the ALJ's finding, in the context of her RFC analysis, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her alleged] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ."  AR 25.

### C.     Conservative Treatment

Plaintiff also attacks the ALJ's observation that Plaintiff "received conservative treatment" for her physical impairments and "refused additional injections, despite reporting 80% pain improvement."  AR 28.  The ALJ cited this evidence in the context of her credibility finding as an added reason why the ALJ discounted Plaintiff's allegations of "severe restrictions in her ability to sit, stand, [and] walk."  *Id.*  Although Plaintiff argues that her decision to opt for conservative treatment should not be held against her, Pl.'s Reply. Mem. at 7-8, "[c]ourts in this Circuit routinely uphold credibility determinations in which the ALJ finds a claimant's statements about their symptoms not credible based, *inter alia*, on a conservative treatment record."  *Dixon v. Berryhill*, No. 17-cv-334 (AJP), 2017 WL 3172849, at *16 n.33 (S.D.N.Y. July 26, 2017) (quotation marks omitted) (collecting cases).  It was appropriate for the ALJ to consider evidence in the record that reflected Plaintiff's decisions to decline taking certain medications.  *See* AR 26 ("In January 2019, [Plaintiff] refused injections, Cymbalta, Gabapentin, and Lyrica, but she enrolled his [*sic*] physical therapy.") (citing AR 460, 463); *see also* AR 441-42 (progress note for June 27, 2018 appointment states that Plaintiff is not interested in injections

or prescription medications).  It was also appropriate for the ALJ to consider Plaintiff's decision

to decline to proceed with radiofrequency ablation treatment following medial branch block

injections, when the injections had provided the 80 percent improvement referenced by the ALJ.[9]

*See* AR 28 (citing AR 584-89); *see also* AR 685 (progress note for appointment on July 1, 2019

states that if Plaintiff "does RFA her prognosis is good"); *Heagney-O'Hara v. Comm'r of Soc.*

*Sec.*, 646 F. App'x 123, 126 (2d Cir. 2016) (summary order) ("An ALJ is required to consider a

variety of factors when assessing a claimant's credibility, including whether the claimant has

received treatment, other than medication, to relieve her symptoms.  *See* 20 C.F.R. §

404.1529(c)(3)(v).  Thus, it was entirely proper for the ALJ to consider [the plaintiff's] decision

not to pursue surgery when assessing her credibility.").[10]

---

[9] A medial branch block "is a type of spinal injection to temporarily block the pain signals coming from the medial nerves.  Medial nerves run through the facet . . . joints.  Facet joints are joints in your spine that allow for movement between vertebrae."  "Medial Branch Block," Intermountain Healthcare, https://intermountainhealthcare.org/services/pain-management/treatments-and-procedures/procedures/medial-branch-block/ (last visited 9/29/2022).  "A medial branch block can provide temporary pain relief, but is mostly a diagnostic tool to determine the source of your back pain and the next steps in your treatment plan."  *Id.*

A radiofrequency ablation ("RFA") "is a treatment used to reduce frequent or persistent pain.  RFA is commonly used to help those suffering from arthritis find relief from joint pain in the back and neck."  "Radiofrequency Ablation," Intermountain Healthcare, https://intermountainhealthcare.org/services/pain-management/treatments-and-procedures/procedures/radiofrequency-ablation/ (last visited 9/29/2022).  "Each individual is different, but in most cases relief from pain following an RFA treatment can last several months to many years."  *Id.*

[10] At her May 28, 2020 pain management appointment, Plaintiff reported that her low back pain was "back to baseline," and although she reported that the medial branch block injections "were very painful and she [was] scared of getting more injections," AR 797, the treatment plan was to "order bilateral L2-3-4 5 therapeutic MBB's" and give Plaintiff Valium "to take beforehand for needle phobia," AR 798.

### D.        Consideration of Non-Examining State Agency Sources

Finally, the ALJ did not err in finding persuasive the opinions of the non-examining State Agency sources, Dr. Saeed and Dr. Naroditsky.  The SSA's current regulations regarding the consideration of medical opinions "eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning weight to a medical opinion." *Victor B. v. Comm'r of Soc. Sec.*, No. 20-cv-1154 (FPG), 2021 WL 3667200, at *2 (W.D.N.Y. Aug. 18, 2021) (quotation marks omitted).  Furthermore, "when supported by evidence in the record, the opinion of a nonexamining physician can also constitute substantial evidence." *Rose o/b/o X.G.T.A. v. Berryhill*, No. 18-cv-509 (LGS) (SN), 2019 WL 2453352, at *3 (S.D.N.Y. Feb. 4, 2019), *adopted by* 2019 WL 2498279 (S.D.N.Y. June 17, 2019).  Here, the ALJ found these opinions persuasive "as both physicians reviewed the available evidence, have specialties, and program knowledge."  AR 28.  The ALJ also noted that the findings of Dr. Saeed and Dr. Naroditsky were "consistent with MRI results and physical examinations." *Id.*  Accordingly, these opinions satisfy the factors of both supportability—they are supported by the physicians' review of the record and the conclusions drawn therefrom—and consistency, as the objective evidence in the record is consistent with the finding that Plaintiff was not as physically limited as she claimed.  The ALJ therefore did not err in finding these opinions persuasive.

## IV.    Failure to Follow the Requirements of SSR 96-8p

Plaintiff argues that the ALJ failed to follow the requirements of SSR 96-8p, which states that an "RFC assessment must be based on *all* of the relevant evidence in the case record[.]"  Pl.'s Mem. of Law at 22-23 (quoting SSR 96-8p (emphasis in original)).  This argument is based on the ALJ's alleged failures in evaluating the medical opinion evidence and her purported cherry-picking of the evidence in the record. *Id.*  Because the Court finds, for the reasons set

forth above, that the ALJ's RFC assessment was legally correct and supported by substantial evidence, the argument that the ALJ failed to consider all of the relevant evidence is unavailing.

## V.        Failure to Properly Consider the Vocational Expert's Testimony

Plaintiff maintains that "[s]ince the hypothetical to the VE was not based on substantial evidence, the VE's testimony similarly cannot stand as substantial evidence."  Pl.'s Mem. of Law at 23.  More specifically, Plaintiff argues that "there was no basis for the ALJ to provide to the VE a hypothetical that there can be apparently unlimited interactions with supervisors and coworkers and only occasional interaction with the public," *id.*, and that "[i]n order to effectively rely on the VE's testimony," the ALJ "should have analyzed how much time Plaintiff would not be able to function given that she could not move her neck, how much time she would be off-task, and how many days she would be absent or late."  *Id.* at 24.

First, the ALJ did not err with respect to assigning different limitations on interaction with supervisors and co-workers as opposed to members of the public.  Although the ALJ did not explain her reasoning for doing so, she still provided sufficient explanation for her RFC finding that Plaintiff suffered no more than moderate mental limitations and, as explained above, that finding is legally correct and supported by substantial evidence.  *See O'Connor v. Comm'r of Soc. Sec.*, No. 17-cv-6826L, 2019 WL 1970514, at *2 (W.D.N.Y. May 3, 2019) ("While the ALJ did not engage in a piece-by-piece breakdown of each and every aspect of the opinions he reviewed, and did not specify his reasoning for assigning different levels of limitation with respect to plaintiff's ability to interact with coworkers (occasional), the general public (never) and supervisors (unlimited), the ALJ's opinion nonetheless furnishes sufficient explanation of the basis for his conclusions that plaintiff's non-exertional limitations are no more than moderate, and that plaintiff retains the RFC to perform work existing in significant numbers in the national

economy."). But even if the ALJ erred in failing to further limit Plaintiff's interaction with supervisors and coworkers in her RFC finding, such error was harmless, "since the jobs identified by the vocational expert were unskilled positions which do not involve more than occasional interaction with supervisors [and coworkers] in any event." *Id.* at *3.

Second, there is no evidence in the record—and Plaintiff points to none—to support a finding that Plaintiff would be off-task more than 10 percent of the time or absent more than one day a month, such that she would be unable to perform any type of job. At the hearing, the VE testified that "[n]ormally, employers should not tolerate a person being off-task more than 10 percent of the workday . . . . Generally, employers would not tolerate more than one unscheduled absence a month." *See* AR 57. There is no evidence that Plaintiff would be precluded from work because she could not move her neck, nor is there any evidence to support a finding that her physical impairments would cause any issues with respect to staying on task or attending work on a regular basis. With respect to her mental impairments, Dr. Schaich opined that Plaintiff had only a "[m]oderate limitation in the ability to sustain an ordinary routine and regular attendance at work," AR 309, and he found, consistent with the mental status examinations elsewhere in the record, that Plaintiff's attention and concentration were intact, AR 308; *see* AR 314, 440, 539, 563-74, 581, 588, 694, 711, 716, 762, 770, 798, 814-19.

In sum, because the hypothetical posed to the VE was based on the ALJ's RFC determination which, as set forth above, was legally correct and supported by substantial evidence, the ALJ did not err in relying on the VE's testimony at step five of her analysis. This testimony constitutes substantial evidence to support the ALJ's conclusion that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *See, e.g.*, *Snyder v. Colvin*, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order) ("When the hypothetical posed

to the vocational expert is based on a [RFC] finding that is supported by substantial evidence, the hypothetical is proper and the ALJ is entitled to rely on the vocational expert's testimony.").

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF No. 27) is DENIED, the Commissioner's cross-motion for judgment on the pleadings (ECF No. 29) is GRANTED, and the Clerk of Court is directed to enter judgment in favor of the Commissioner.

Dated: September 30, 2022
      White Plains, New York

                      **SO ORDERED**.

                      _____

                      ANDREW E. KRAUSE
                      United States Magistrate Judge